| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |

| | |
|---|---|
| MELISA ANGELA CHRISTIAN, | § |
| | § |
| Appellant, | § |
| | § |
| *versus* | § CIVIL ACTION NO. 4:17-CV-493 |
| | § |
| PACIFIC WESTERN BANK, | § |
| | § |
| Appellee. | § |

**MEMORANDUM AND ORDER**

Pending before the court is Appellant Melisa Angela Christian's ("Christian") appeal from the judgment of the United States Bankruptcy Court for the Eastern District of Texas ("E.D. Bankruptcy Court"), wherein the bankruptcy court found that a civil contempt order for $100,000.00 (the "Contempt Amount") entered by the United States Bankruptcy Court for the Northern District of Texas ("N.D. Bankruptcy Court") is a non-dischargeable debt and thus was not discharged by the Order of Discharge entered by the E.D. Bankruptcy Court. Having reviewed the bankruptcy judge's opinion, the record, the submissions of the parties, and the applicable law, the court is of the opinion that the E.D. Bankruptcy Court's decision should be reversed.

I. Background

Christian, a dentist, was the president, sole owner, and guarantor of Travis Walk Dental Care ("Travis Walk"),[1] a dental office in Dallas, Texas. In the course of business, on October 27, 2011, Travis Walk executed a loan agreement and U.S. Small Business Administration Note

---

[1] Any reference to Travis Walk encompasses both the entity itself and Christian in her capacity as sole owner, president, and guarantor.

("the Note") in favor of Appellee Pacific Western Bank ("PacWest").[2] The terms of the Note were subsequently modified by a loan extension and modification agreement entered into by Travis Walk and PacWest.

On November 3, 2014, Travis Walk filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the N.D. Bankruptcy Court (the "Travis Walk Bankruptcy Action"). Travis Walk filed an Emergency Motion for Interim Use of Cash Collateral, which the N.D. Bankruptcy Court granted on March 10, 2015 (the "Cash Collateral Order"). Pursuant to the Cash Collateral Order, Travis Walk was authorized to use the funds in the Cash Collateral Account for approved expenses. As further protection for PacWest, Travis Walk's largest creditor, the Cash Collateral Order required Travis Walk to pay PacWest "the amount of all excess funds on hand after payment of approved expenses." The Cash Collateral Order, along with Travis Walk's ability to use the cash collateral, was set to expire on March 31, 2015.[3]

Travis Walk, however, made no payments to PacWest, in violation of the Cash Collateral Order. Therefore, PacWest filed an Emergency Motion for Entry of Order for Relief from the Automatic Stay, which the court granted on June 5, 2015 (together with the Cash Collateral Order, the "Cash Collateral Orders"). Accordingly, the N.D. Bankruptcy Court ordered Travis Walk to wire to PacWest all cash in its debtor-in-possession accounts within three days. Again, Travis

---

[2] The Note, as executed, was actually in favor of PacWest's predecessor, CapitalSource Bank. After the Note was executed, PacWest became the successor to CapitalSource Bank due to a merger. Thus, PacWest became the holder of the Note. The total principal amount of the Note was $1,650,000.00.

[3] The Cash Collateral Order gave Travis Walk and PacWest the ability to extend the termination date; however, the parties elected not to extend it.

2

Walk failed to comply with the court's order.[4]  Therefore, on September 4, 2015, PacWest filed a Motion to Show Cause asking the N.D. Bankruptcy Court to require Travis Walk to show cause why it should not be held in contempt for violating the Cash Collateral Orders.  Additionally, PacWest requested that a contempt order be entered against Travis Walk and Christian for their repeated refusal to comply with the court orders.  The N.D. Bankruptcy Court scheduled a hearing on this matter for October 19, 2015.

Three days before the scheduled hearing, however, Christian filed an individual, voluntary petition under Chapter 7 of the Bankruptcy Code in the E.D. Bankruptcy Court (the "Christian Bankruptcy Action").[5]  Consequently, the show cause hearing in the N.D. Bankruptcy Court was cancelled.  PacWest then sought relief from the automatic stay in the Christian Bankruptcy Action to proceed with the show cause hearing in the Travis Walk Bankruptcy Action.  Christian did not oppose PacWest's request and, thus, on December 2, 2015, the E.D. Bankruptcy Court granted PacWest relief from the automatic stay and permitted the show cause hearing in the N.D. Bankruptcy Court to proceed.  Significantly, the E.D. Bankruptcy Court expressly authorized PacWest to ask the N.D. Bankruptcy Court to hold Christian in contempt of court and for any and

---

[4] Specifically, it appears that Travis Walk made two payments totaling approximately $22,000.00 at some point later than the required three days.  This amount, however, was not all the cash that Travis Walk had on hand at that time.  Indeed, Christian testified at the show cause hearing that the total in Travis Walk's checking and savings accounts as of May 31, 2015, amounted to $86,130.90.  Thus, these payments did not comply with the court order.

[5] Christian's individual petition was filed on October 16, 2015.  According to Christian, when the plan of reorganization was denied in the Travis Walk Bankruptcy Action, she determined that the company was no longer viable and shut it down in May 2015.  Subsequently, Travis Walk filed a motion to dismiss the Travis Walk Bankruptcy Action, to which PacWest filed a limited objection based on Travis Walk's failure to comply with the Cash Collateral Order.  Thereafter, Christian elected to file her individual Chapter 7 action rather than pursue the Chapter 11 reorganization.  Christian listed PacWest as a creditor in that action.  Notably, no creditor, including PacWest, filed any objections in the Christian Bankruptcy Action.

all damages available to it. The N.D. Bankruptcy Court then rescheduled the show cause hearing for December 18, 2015. The hearing was held as scheduled, and, on December 30, 2015, the N.D. Bankruptcy Court granted PacWest's motion and ordered Travis Walk and Christian to appear on January 27, 2016, to show cause why the court should not enter an order holding each in contempt for violating the Cash Collateral Orders and issue sanctions against them. On January 27, 2016, Christian and PacWest appeared before the N.D. Bankruptcy Court. At the show cause hearing, PacWest offered evidence that Christian had knowledge of and understood the court's orders and nevertheless continued to expend funds from the Travis Walk accounts after the termination date of the Cash Collateral Order. Further, PacWest demonstrated that Christian used funds from the Travis Walk accounts to open a new dental practice. The N.D. Bankruptcy Court took the matter under advisement, indicating that it would issue a ruling at a later date.

On January 30, 2016, prior to a ruling from the N.D. Bankruptcy Court, the E.D. Bankruptcy Court entered the Order of Discharge granting Christian a discharge in the Christian Bankruptcy Action. Subsequently, on February 3, 2016, the N.D. Bankruptcy Court issued an oral ruling on the record holding Christian and Travis Walk in contempt for violating the Cash Collateral Orders. Thereafter, on February 8, 2016, the N.D. Bankruptcy Court entered the Civil Contempt Order, which held Christian and Travis Walk jointly and severally liable for the Contempt Amount.[6] Christian and Travis Walk failed to pay the Contempt Amount to PacWest.

---

[6] Specifically, the total included: (1) $80,000.00 to which PacWest would have been entitled had unauthorized payments and transfers not been made from Travis Walk's accounts; and (2) $20,000.00 in attorney's fees incurred by PacWest in seeking to compel Travis Walk's compliance with the Cash Collateral Orders. Additionally, the Contempt Order required Travis Walk to provide an accounting to PacWest.

On May 27, 2016, PacWest initiated an adversary proceeding against Christian in the E.D. Bankruptcy Court, asking the court to hold that the Contempt Amount owed by Christian is not dischargeable. Both parties filed cross-motions for summary judgment. The E.D. Bankruptcy Court granted summary judgment in PacWest's favor on June 29, 2017, concluding that the Contempt Amount is a valid post-petition debt. Thus, the court held that the Contempt Amount was not discharged by the Order of Discharge in the Christian Bankruptcy Action. Christian appeals from this decision.

II. Analysis

A. Jurisdiction

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges. 28 U.S.C. § 158(a). An appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts." *Id*. § 158(c)(2). Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court." *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992); *accord Perry v. Dearing (In re Perry)*, 345 F.3d 303, 308-09 (5th Cir. 2003); *In re S. White Transp., Inc.*, 473 B.R. 695, 698 (S.D. Miss. 2012), *aff'd*, 725 F.3d 494 (5th Cir. 2013).

B. Standard of Review

In reviewing a decision of the bankruptcy court, Rule 8013 of the Federal Rules of Bankruptcy Procedure requires the court to accept the bankruptcy court's findings of fact unless clearly erroneous and to examine *de novo* the conclusions of law. *See In re Halo Wireless, Inc.*,

684 F.3d 581, 586 (5th Cir. 2012); *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008); *Texas v. Soileau (In re Soileau)*, 488 F.3d 302, 305 (5th Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008). Mixed questions of law and fact are reviewed *de novo*. *Tech. Lending Partners, LLC v. San Patricio Cty. Cmty. Action Agency (In re San Patricio Cty. Cmty. Action Agency)*, 575 F.3d 553, 557 (5th Cir. 2009). "The standard of review for the granting of summary judgment and the denial of a cross-motion for summary judgment is *de novo*." *St. Paul Fire & Marine Ins. Co. v. Whitaker Constr., Inc.*, Nos. CIVA 06-1595, 02BK12642, ADVNO 03AP1113, 2007 WL 196903, at *2 (W.D. La. Jan. 23, 2007), *aff'd*, 288 F. App'x 153 (5th Cir. 2008); *see CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009).

    C.    <u>Arguments in Support of Appeal</u>

Christian appeals the E.D. Bankruptcy Court's judgment on two grounds. First, Christian maintains that the Contempt Amount accrued prior to the filing of the petition in the Christian Bankruptcy Action and, thus, is a dischargeable pre-petition debt. Notably, this is the only argument set forth in Christian's Opening Brief. Second, in her Reply Brief, Christian contends that the Contempt Order merely permitted PacWest to proceed with the contempt hearing but did not authorize the N.D. Bankruptcy Court to order the payment of any sanction. To the extent that the Contempt Order sought to authorize the N.D. Bankruptcy Court to order sanctions, Christian argues such would violate the automatic stay and therefore be invalid. In response to Christian's second argument, PacWest avers that Christian waived and abandoned it by not raising it in her Opening Brief.

1. <u>Waiver of Arguments Not Addressed in Opening Brief</u>

The United States Court of Appeals for the Fifth Circuit has held that "an appellant abandons all issues not raised in its *initial* brief." *United Paperworkers Int'l Union, AFL-CIO, CLC v. Champion Int'l Corp.*, 908 F.2d 1252, 1255 (5th Cir. 1990) (citing *Piney Woods Country Life Sch. v. Shell Oil Co.*, 671 F.2d 154, 156 (5th Cir. 1982)); *accord Ocwen Loan Servicing, L.L.C. v. Moss*, 628 F. App'x 327, 328 (5th Cir. 2016); *AAR, Inc. v. Nunez*, 408 F. App'x 828, 830 (5th Cir. 2011) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir.), *cert. denied*, 513 U.S. 868 (1994)). Thus, "any issues not raised or argued in the appellant's [opening] brief are considered waived and will not be entertained on appeal." *United Paperworkers Int'l Union*, 908 F.2d at 1255 (citing *Tex. Mortg. Servs. Corp. v. Guadalupe Sav. & Loan Ass'n (In re Tex. Mortg. Servs. Corp.)*, 761 F.2d 1068, 1073-74 (5th Cir. 1985)); *accord Windhauser v. Bd. of Supervisors for La. State Univ. & Agr. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010) (citation omitted); *United States v. Pompa*, 434 F.3d 800, 806 n.4 (5th Cir. 2005) (citing FED. R. APP. P. 28(a)(9)(A); *United Paperworkers Int'l Union*, 908 F.2d at 1255); *United States v. Ogle*, 415 F.3d 382, 383 (5th Cir.) (collecting cases), *cert. denied*, 546 U.S. 1079 (2005).

In this case, Christian's Opening Brief presents two issues:

(1) Did the Bankruptcy Court err in concluding the civil contempt order entered on February 8, 2016, . . . is a valid, post-petition debt owed by Appellant? (2) Did the Bankruptcy Court err in concluding the Contempt Claim is a non-dischargeable debt and thus not discharged by the Order of Discharge entered on January 30, 2016?

Christian's initial argument focuses exclusively on these two issues. Accordingly, Christian waived and abandoned all other arguments, including those related to the automatic stay and the

validity of the Contempt Order. The court, therefore, will consider the only issue properly briefed on appeal: whether the Contempt Amount is a non-dischargeable, post-petition debt.

### 2. Dischargeability of the Contempt Amount

The basic purpose of the bankruptcy system is to provide debtors with a "fresh start." *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 674 (5th Cir. 2012); *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 755 (5th Cir. 2008) (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)), *cert. denied*, 559 U.S. 1005 (2010). To achieve this end, the Bankruptcy Code grants debtors a discharge from certain debts. 11 U.S.C. § 727. Bankruptcy discharge, however, "is not a matter of right but rather a statutory privilege afforded a debtor who meets certain requirements." *Hazelip v. Horridge (In re Horridge)*, 127 B.R. 798, 799 (S.D. Tex. 1991). Nevertheless, "statutes such as the Bankruptcy Code are to be liberally construed in favor of the debtor in order to better facilitate the debtor's 'fresh start.'" *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834, 840 (Bankr. W.D. La. 1995) (citations omitted); *accord Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 38 (2008) (quoting *In re Piccadilly Cafeterias, Inc.*, 484 F.3d 1299, 1304 (11th Cir. 2007)).

Chapter 7 of the Bankruptcy Code "discharges the debtor from all debts that arose *before* the date of the order of relief under [the Bankruptcy Code]." 11 U.S.C. § 727(b) (emphasis added); *accord Citizens Bank & Tr. Co. v. Case (In re Case)*, 937 F.2d 1014, 1024 (5th Cir. 1991) ("[T]he Bankruptcy Code provides the debtor a general discharge of all debts which arose before the filing of the petition."); *Placid Oil Co. v. Williams (In re Placid Oil Co.)*, 463 B.R. 803, 812 (Bankr. N.D. Tex. 2012). The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). "The term 'claim' means . . . right to payment, whether or not

8

such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 101(5)(A); *accord In re Placid Oil Co.*, 463 B.R. at 812. "The legislative history of the Code indicates that Congress intended the term 'claim' to be given broad interpretation so that 'all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case.'" *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1275 (5th Cir. 1994) (quoting H.R. Rep. No. 595, 95th Cong. 1st Sess. 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266); *In re Placid Oil Co.*, 463 B.R. at 812. "The courts accordingly have given a broad and expansive reading to the term 'claim.'" *In re Nat'l Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992) (citing *Ohio v. Kovacs*, 469 U.S. 274, 279 (1985)); *see Egleston v. Egleston (In re Egleston)*, 448 F.3d 803, 812 (5th Cir. 2006); *Cadleway Props., Inc. v. Andrews (In re Andrews)*, 239 F.3d 708, 710 (5th Cir. 2001). Further, while the Bankruptcy Code does not define the term "contingent claim," "the Fifth Circuit defines a claim as contingent if the debt 'is one which will be called upon to pay only upon the occurrence or happening of an extrinsic event that will trigger the liability of the debtor to the alleged creditor.'"[7] *AMPAM Power Plumbing, L.P. v. Capstone Bldg. Corp. (In re AMPAM Power Plumbing, L.P.)*, 520 B.R. 553, 557 (Bankr. W.D. Tex. 2014) (quoting *First City*

---

[7] In this case, PacWest's claim for contempt is a contingent one because, although it is predicated on Christian's conduct regarding the Cash Collateral Orders, Christian could only be called upon to pay for her ostensibly contemptuous conduct if the bankruptcy court issued a contempt order against her. *See Giardina v. Parnell (In re Giardina)*, No. 00-17867, 2004 WL 4945988, at *3 (E.D. La. Aug. 31, 2004) ("A claim that arises from or is rooted in the pre-petition acts of the debtor, even where those claims are fixed and entered by the court after the discharge, are treated as pre[-]petition claims that are discharged."); *see also Jordahl v. Dyal (In re Jordahl)*, 555 B.R. 861, 867 (Bankr. S.D. Ga. 2016) ("Here, Jordahl had only contingent liability for the costs and attorney's fees until the entry of an order establishing the amount of the debt and his obligation to pay."); *In re Bennett*, No. 09-36637, 2012 WL 2562418, at *5 (S.D. Tex. June 28, 2012) (explaining that legal fees are a contingent pre-petition debt because they "are contingent upon a creditor's obtaining a favorable outcome in [post-petition] litigation").

9

*Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1051 (5th Cir. 1992)); *see In re Giardina*, 2004 WL 4945988, at *2 (citation omitted) ("A claim is not rendered a post-petition claim simply because the time for payment is triggered by an event that happens postpetition.").

There is much debate on how broadly the term "claim" is to be interpreted in the context of future or contingent claims. Significantly, the question of how such term should be interpreted with regard to a contingent contempt claim has not been addressed in this context.[8] Generally, in defining the term as it pertains to future and contingent claims, courts take three different approaches. Some courts apply the accrual theory. Under this approach, "a 'claim' does not arise in bankruptcy until a cause of action has accrued under non-bankruptcy law." *Lemelle*, 18 F.3d at 1275 (citations omitted); *see Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 258 (5th Cir.) (explaining the court's prior application of the accrual theory), *cert. denied*, 136 S. Ct. 417 (2015). Other courts utilize the conduct test, under which a "claim" "arises at the moment the conduct giving rise to the alleged liability occurred." *Lemelle*, 18 F.3d at 1275 (citations omitted); *accord In re Cantu*, 784 F.3d at 259. Thus, under the conduct theory, "if a debtor's conduct forming the basis of liability occurred pre-petition," the claim also arises pre-petition. *Lemelle*,

---

[8] PacWest relies heavily on *In re Bennett*, an unreported case out of the Southern District of Texas that discusses contempt claims. 2012 WL 2562418. In that case, the court stated that "[p]ost-petition misconduct, even in connection with a pre-petition discharged debt, may give rise to *additional* sanctions—sanctions that are not discharged." *In re Bennett*, 2012 WL 2562418, at *4 (emphasis added). PacWest maintains that this language stands for the proposition that a post-petition contempt order issued in connection with a pre-petition debt is not dischargeable. This interpretation, however, is misguided. Rather, the issue in that case was whether the creditor could request *additional* sanctions, after discharge, "based upon the failure of Debtors to comply with" a contempt order issued post-petition but predicated upon pre-petition conduct. *See id*. There, the additional sanctions being sought were specifically for the debtor's post-petition conduct. *Id*. In this case, however, PacWest's Motion to Show Cause was predicated solely on pre-petition conduct, although the Contempt Order was ultimately issued based upon both pre- and post-petition conduct. Pac-West does not seek additional sanctions arising from Christian's post-petition violations of the Contempt Order, as was done in *In re Bennett*. Therefore, *In re Bennett* is distinguishable from the case at bar.

18 F.3d at 1275. Finally, under the pre-petition relationship test, a claim arises at the time of the conduct forming the basis for liability only if the debtor and claimant had some type of relationship at that time. *Wheeler v. Magdovitz (In re Wheeler)*, 137 F.3d 299, 300-01 (5th Cir. 1998); *Lemelle*, 18 F.3d at 1277 (adopting the pre-petition relationship test). Hence, a claim arises pre-petition if there is a pre-petition "relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant." *Lemelle*, 18 F.3d at 1277 (quoting *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla. 1994)).

Unsurprisingly, the parties disagree as to which approach applies here. While Christian urges the court to apply the pre-petition relationship test, PacWest appears to suggest that the court deviate from all three approaches. In its brief, PacWest maintains that "the more appropriate inquiry to determine dischargeability of a contempt order is whether the contempt order was entered before or after a petition date." This argument, however, contravenes established law. *See* 11 U.S.C. § 101(5)(A) (defining "claim" as a right to payment "whether or not such right is reduced to judgment"); *Lemelle*, 18 F.3d at 1274-78 (explaining that tort liability not yet reduced to judgment may still be a "claim" for purposes of bankruptcy discharge). Therefore, the court rejects this position.

Importantly, the Fifth Circuit has expressly adopted the pre-petition relationship test in many scenarios.[9] *See, e.g.*, *In re Digicon, Inc.*, 2003 WL 21418127, at *1, *4 (approving the district court's application of the pre-petition relationship test in a contract dispute involving a partnership agreement); *In re Wheeler*, 137 F.3d at 301 (applying the pre-petition relationship test in a legal malpractice action); *Lemelle*, 18 F.3d at 1268 (adopting the pre-petition relationship test in a tort case). Nonetheless, the court need not determine which approach applies to a contingent contempt claim because, in this case, each method leads to the same conclusion: PacWest's claim for contempt is a pre-petition claim and, thus, was discharged in the Christian Bankruptcy Action.

  a. <u>The Accrual Theory</u>

The accrual theory is viewed as the most conservative approach. Indeed, courts have criticized that it "interprets the term 'claim' more narrowly than Congress intended." *Lemelle*, 18 F.3d at 1275 (citations omitted); *accord In re Egleston*, 448 F.3d at 813 (citations omitted). As explained above, under this approach a debt "does not arise in bankruptcy until a cause of action has accrued under non-bankruptcy law." *Lemelle*, 18 F.3d at 1275. "The accrual of a cause of action means the right to institute and maintain a suit, and whenever one person may sue another a cause of action has accrued." *In re Cantu*, 784 F.3d at 260 (quoting *State Farm Life*

---

[9] In *Cantu*, however, the Fifth Circuit expressly rejected the pre-petition relationship test for cases in which the court must decide the timing of a claim where the primary issue is whether the claim belongs to the debtor or the bankruptcy estate. 784 F.3d at 259 (holding that the accrual approach applies in such cases). In doing so, the court stated that the pre-petition relationship test applies when determining whether a claim asserted against the debtor was discharged. *Id.* This suggests that the Fifth Circuit envisioned the pre-petition relationship test to apply in all scenarios where a claim is asserted against a debtor and the issue is whether such claim was discharged. *See id.*; *Ocean Marine Servs. P'ship No. 1 v. Digicon, Inc. (In re Digicon, Inc.)*, 71 F. App'x 442, 2003 WL 21418127, at *4 (5th Cir. June 11, 2003) ("The Fifth Circuit has adopted a very broad definition of 'claim' essentially adopting the pre-petition relationship test used in [*Piper*]."); *In re AMPAM Power Plumbing, L.P.*, 520 B.R. at 558 ("In *Lemelle* . . ., the Fifth Circuit adopted the *Piper* pre-petition relationship approach.").

*Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795 (5th Cir. 1997)). Civil contempt, by nature, is a "backward-looking" cause of action. *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 264 (5th Cir. 2009). A cause of action for civil contempt accrues when: (1) a court order is in effect; (2) the order requires certain conduct; and (3) the person required to take the conduct fails to comply with the court order. *Id.* (citing *Fed. Deposit Ins. Corp. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)).

The Contempt Order in this case is predicated upon two prior court orders. First, the Cash Collateral Order went into effect on March 10, 2015, the date on which it was issued. The Cash Collateral Order required Travis Walk to pay PacWest the excess amount in its accounts "no later than the fifth business day after each month." Travis Walk, however, made no payments to PacWest. Therefore, Travis Walk and Christian were liable for civil contempt as early as the "fifth business day" of April 2015.

Thereafter, on June 5, 2015, the court issued the Order Modifying the Automatic Stay, which was effective immediately. In this order, the N.D. Bankruptcy Court required Travis Walk to wire all cash on hand within three business days, or by June 10, 2015.[10] Although some funds were ultimately forwarded to PacWest, these payments were made several days past the deadline specified in the order. Further, the payments did not amount to all cash on hand, as required by the order. Hence, Travis Walk and Christian were in violation of this order, and, thus, liable for civil contempt as of June 10, 2015. Significantly, PacWest filed its Show Cause Motion seeking a contempt ruling against Travis Walk and Christian on September 4, 2015; therefore, PacWest

---

[10] June 5, 2015, was a Friday. Thus, the order did not require action until the following Wednesday, June 10.

sought to recover on its contempt claim, which had accrued, prior to Christian's petition date. Accordingly, under the accrual theory, the Contempt Amount is a pre-petition debt.

b. The Conduct Test

On the opposite end of the spectrum is the conduct test, under which a claim arises when the conduct forming the basis of liability occurs, regardless of whether the injury resulting from the conduct has yet manifested. *In re Egleston*, 448 F.3d at 813; *Lemelle*, 18 F.3d at 1275. In other words, a claim can arise pre-petition, so long as the conduct giving rise to it occurs pre-petition, even though a cause of action has not yet accrued under non-bankruptcy law. *In re Egleston*, 448 F.3d at 813. Application of the conduct test typically "results in the claim being discharged." *In re Cantu*, 784 F.3d at 258 (citing *Jeld-Wen, Inc. v. Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 199, 203 (4th Cir. 1988)).

Here, the conduct giving rise to PacWest's contempt claim is Christian's violation of the N.D. Bankruptcy Court's Cash Collateral Orders. This conduct commenced as early as the beginning of April 2015 and has continued to this date. Because Christian's conduct began pre-petition, however, PacWest's claim is a pre-petition one under the conduct test.[11]

c. The Pre-Petition Relationship Test

Courts that have adopted the pre-petition relationship test deem it the middle-ground approach. *In re Cantu*, 784 F.3d at 258. Pursuant to this test, the nature of the debtor's conduct is not as relevant as the debtor's relationship to the creditor at the time of the conduct. *Lemelle*,

---

[11] In this instance, the conduct giving rise to the claim and the injury from that conduct occurred simultaneously. Hence, application of the conduct test renders the same result as the accrual theory, which typically works in favor of a creditor whose injury is not apparent until post-petition.

18 F.3d at 1276. Thus, the salient question becomes "whether the purported claimant had a specific and identifiable relationship with the debtor prepetition." *Beeter v. Tri-City Prop. Mgmt. Servs., Inc. (In re Beeter)*, 173 B.R. 108, 119 (Bankr. W.D. Tex. 1994) (citing *Lemelle*, 18 F.3d at 1276). Under this approach, bankruptcy courts will apply the conduct test "*only if* there is 'evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings.'" *In re Cantu*, 784 F.3d at 259 (emphasis added) (quoting *Lemelle*, 18 F.3d at 1277). Courts utilizing this approach reason that such a notice requirement protects potential claimants from due process violations. *Id.* ("Absent such evidence of notice, potential claimants might be denied due process if their later-arising claims were discharged in an earlier bankruptcy they knew nothing about."). Consequently, courts look for "evidence of pre-petition contact, privity or other relationship" between the parties. *In re Wheeler*, 137 F.3d at 301.

In this case, it is undisputed that PacWest, Christian, and Travis Walk have had numerous contacts throughout their extended relationship. The parties dispute, however, the specific time in the relationship that would fairly give rise to a claim. Christian points out that the parties have had a long relationship, which began when the Note was executed. Further, Christian points out that PacWest was listed as a creditor in the Travis Walk Bankruptcy Action as well as in the Christian Bankruptcy Action. According to Christian, the most pivotal and relevant point in their relationship is the date on which PacWest filed the Show Cause Motion, which occurred pre-petition. Conversely, PacWest contends that "the Contempt Order . . . created a new relationship [between the parties]: that of a contemnor and a contemnee, which forms the basis of Christian's

15

post-petition (and therefore non-dischargeable) obligation to PacWest."[12] Essentially, PacWest views each separate contact between the parties as a new and discrete relationship. The court declines to adopt this viewpoint.

The pre-petition relationship test is concerned with a creditor's due process rights. *In re Cantu*, 784 F.3d at 259. Thus, courts have predominantly focused on the contact that would have fairly put the creditor on notice that it had a claim against a debtor, such that the creditor could take action to protect its rights. *See id*. Ideally, if this contact transpired pre-petition, the creditor could then file a claim or objection in the debtor's bankruptcy action. Here, the court finds that the long and tumultuous relationship between Christian and PacWest warrants application of the pre-petition relationship test. More specifically, the events that occurred throughout the Travis Walk Bankruptcy Action provided sufficient contacts from which PacWest should have known that it had a claim against Christian. Initially, the N.D. Bankruptcy Court entered the Cash Collateral Order, to which Travis Walk, Christian, and PacWest were all parties. Indeed, PacWest was the beneficiary of this order. Thereafter, the N.D. Bankruptcy Court issued the Order Modifying the Automatic Stay, which was also for PacWest's benefit. Christian, however, violated both orders, which prompted PacWest, prior to Christian's Chapter 7 petition date, to file the Show Cause Motion. Certainly, as of that date, PacWest was on notice that it had a new and distinct claim

---

[12] Moreover, PacWest maintains that this relationship "was created *only* after Christian continued her contemptuous conduct following the filing of her personal Chapter 7 bankruptcy petition." This, however, is illogical. First, PacWest filed the Show Cause Motion, which requested the N.D. Bankruptcy Court to hold Christian in contempt for her violations up to that point, prior to the Christian Bankruptcy Action petition date. Further, the conduct discussed during the contempt hearing occurred both pre- and post-petition. Finally, the Contempt Order does not specify that it stems from post-petition conduct only. Rather, the order refers generally to Christian's violation of the pre-petition Cash Collateral Orders.

16

against Christian—namely, a claim for contempt.[13] This is further evidenced by the fact that PacWest subsequently filed a motion to lift the stay in the Christian Bankruptcy Action so that it could proceed with its contempt claim in the N.D. Bankruptcy Court. In that motion, PacWest expressly advised the E.D. Bankruptcy Court that "to the extent a monetary award is entered against [Christian], it will be brought back to this Court and incorporated in the [Christian Bankruptcy Action]." Accordingly, the court is satisfied that the parties had a significant, long-term relationship that justifies application of the pre-petition relationship test, under which, as discussed above, PacWest's claim is a pre-petition one.

III.    Conclusion

Consistent with the foregoing analysis, the E.D. Bankruptcy Court erred in finding that the Contempt Amount is a post-petition debt. Accordingly, the judgment of the bankruptcy court is REVERSED, and judgment is RENDERED in favor of Christian. The Contempt Amount is a pre-petition debt and was, therefore, discharged in the Christian Bankruptcy Action. The Clerk of Court is directed to close the case.

SIGNED at Beaumont, Texas, this 8th day of December, 2017.

*Marcia A. Crone*
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

[13] Therefore, PacWest was in a position to file an objection to discharge of the Christian Bankruptcy Action. PacWest, however, did not. While the court does not condone violations of court orders and finds Christian's conduct to be reprehensible, it recognizes that PacWest was not without recourse. Therefore, PacWest's public policy arguments (urging the court to uphold the integrity of the bankruptcy courts and "the spirit of the Bankruptcy Code" by affirming the E.D. Bankruptcy Court's judgment) are unpersuasive.